**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Anthony Randal-Ashley Villebrun,                          No. 24-cv-504 (KMM/LIB)

      Plaintiff,

v.

                                    **ORDER**

Brandon Keith Nienaber,

      Defendant.

---

This case arises from a traffic stop during which Defendant Brandon Keith Nienaber (Officer Nienaber) tased Plaintiff Anthony Randal-Ashley Villebrun twice. Mr. Villebrun brought this one-count action against Officer Nienaber under 42 U.S.C. § 1983, alleging that his use of a taser constituted excessive force in violation of Mr. Villebrun's Fourth Amendment rights.

Before the Court is Officer Nienaber's Motion for Summary Judgment (Dkt. 23), in which he argues that he was not acting "under color of state law" when he pursued and tased Mr. Villebrun. Alternatively, Officer Nienaber argues that he is entitled to qualified immunity because he did not violate Mr. Villebrun's clearly established constitutional rights. For the reasons discussed below, the motion is denied.

## BACKGROUND

On the evening of October 23, 2021, Officer Nienaber, a uniformed White Earth tribal police officer, was patrolling the White Earth Reservation in a marked squad car that indicated he was an employee of the White Earth Tribal Police Department. (Dkt. 29-2

1

("Nienaber Dep.") at 17:14–17[1]; Dkt. 24-5 at 3–4.) As a White Earth tribal officer, Officer Nienaber was required to be licensed by the Minnesota POST Board, a state agency that manages licensing for state officers. (Nienaber Dep. at 80:12–81:15.) He was also "authorized, pursuant and subject to Minnesota [state law] to enforce the criminal laws of the State of Minnesota" in certain circumstances. (Dkt. 25-6 ("Cooperative Law Enforcement Agreement Between the White Earth Reservation of Chippewa Indians and Becker County, Minnesota").)

While patrolling, Officer Nienaber saw a car "come out of [a] parking lot rather quickly, cross over the highway, and then continue down the road at a[n] accelerated rate." (Nienaber Dep. at 18:25–19:6.) He followed the car on suspicion of speeding and eventually activated his emergency lights to initiate a traffic stop, but the driver sped away. (*Id.* at 21:6–24:21.) According to Officer Nienaber, his basis for pursuing the car at that point "turned into a . . . fleeing in a motor vehicle charge." (*Id.* at 25:19–27:1.) At some point, he saw the driver throw a "brown bag" out of the window. (*Id.* at 32:4–11.) The bag "hit the ground and [its] contents," which were "white in color, round items that rolled away," fell out. (*Id.*) Officer Nienaber suspected that the bag's contents were narcotics. (*Id.* at 33:17–25.)

Officer Nienaber continued to pursue the car on a high-speed chase until it drove off the road into a wooded area on the tribal reservation. (*Id.* at 38:22–39:25; Dkt. 25-2

---

[1] Generally, the Court cites to the pagination generated by the CM/ECF filing system. With respect to deposition testimony, the Court cites to the deposition transcript's internal pagination and line numbers.

("Squad-Car Video") at 8:31–8:35.) At the time, Officer Nienaber, who was the only officer on the scene, "did not know if there was anybody else there" with the driver or "if there w[ere] weapons in the car." (Nienaber Dep. at 39:11–17, 92:19–21.) Officer Nienaber testified that, in his experience, weapons tend to go "hand in hand" with "people who are involved [with] illegal narcotics." (*Id.* at 33:19–25.) The driver, later identified as Mr. Villebrun, exited the car and began to run into the woods but "tripped and [fell]." (*Id.* at 40:3–6.) As Mr. Villebrun "was attempting to get back up," with his hands "down by his waist," Officer Nienaber got out of his squad car and ran towards Mr. Villebrun while instructing him to stop moving. (*Id.* at 40:3–6, 41:3–13; Squad-Car Video at 8:36–8:47.) Instead, Mr. Villebrun stood up and took a few steps away from Officer Nienaber. Officer Nienaber repeated for him to "stop" and pointed his taser at Mr. Villebrun. (Squad-Car Video at 8:47–8:50.) Mr. Villebrun eventually stopped walking and kneeled. (*Id.*)

While Mr. Villebrun knelt with his hands by his sides, Officer Nienaber told him, "Don't f--king move," and to "get down on [his] belly." (*Id.* at 8:50–8:52.) While repeating those instructions, Officer Nienaber pushed Mr. Villebrun, who remained kneeling, forward, but Mr. Villebrun placed his hands in front of himself on the ground so that he did not fully fall forward. (*Id.* at 8:53–8:56.) As Officer Nienaber repeated, "Get on your belly," Mr. Villebrun pushed himself back up to his knees, placed his hands behind his head, and remained still while facing away from Officer Nienaber. (*Id.* at 8:57–8:59.)

 Officer Nienaber continued to tell Mr. Villebrun to "get down on [his] belly" with the taser aimed at Mr. Villebrun's back, but Mr. Villebrun stayed kneeling with his hands behind his head. (*Id.* at 8:58–9:00.) As Mr. Villebrun remained in the same position without

3

moving, despite Officer Nienaber's commands to "get down on [his] belly now," Officer Nienaber tased him from behind without warning and said, "Taser deployed." (*Id.* at 9:00–9:04.) Officer Nienaber testified that pat searching or handcuffing Mr. Villebrun would have "reduce[d] any potential threat of a weapon being used on him" but did not "because [he] did not feel it was safe to do so[.]" (Nienaber Dep. at 46:1–13.) However, Officer Nienaber also noted that Mr. Villebrun did not display "any sort of hostility or aggression," pose a flight risk, or "reach into his jacket[] at any point[.]" (*Id.* at 46:1–13, 47:2–5, 48:8–19.) Moreover, Officer Nienaber did not make "[a]ny other observations, at that point, that led to [his] use of the taser," and Mr. Villebrun "appear[ed] to be submissive[.]" (*Id.* at 49:8–13.)

Upon being tased, Mr. Villebrun fell forward and rolled onto his back, at which point Officer Nienaber grabbed Mr. Villebrun's arms and rolled him onto his side. (Squad-Car Video at 9:03–9:09.) As Mr. Villebrun lay still from the impact of the taser, Officer Nienaber continued trying to get Mr. Villebrun onto his stomach and repeated, "Get down on your f--cking belly." (*Id.* at 9:00–9:09.) While he was on top of Mr. Villebrun, who was on the ground on his back or on his side, Officer Nienaber deployed the taser a second time (*id.* at 9:10–9:13), before eventually handcuffing and arresting Mr. Villebrun (*id.* at 9:09–9:35).[2] Mr. Villebrun received medical care after the incident, which left taser probes and eventual scars in his back. (Villebrun Dep. at 21:11–23:1.)

---

[2] Officer Nienaber's body camera began recording after both times he deployed the taser.

In February 2024, Mr. Villebrun brought this action against Officer Nienaber under 42 U.S.C. § 1983, alleging that Officer Nienaber's use of a taser constituted excessive force in violation of Mr. Villebrun's Fourth Amendment rights.[3] (Dkt. 1 ¶¶ 28–29.) The matter is before the Court on Officer Nienaber's Motion for Summary Judgment (Dkt. 21).

## DISCUSSION

Officer Nienaber seeks summary judgment on Mr. Villebrun's § 1983 claim on two grounds. First, Officer Nienaber argues that he acted under color of tribal, not state, law when he arrested Mr. Villebrun and tased him while doing so. Second, and alternatively, Officer Nienaber claims that he is entitled to qualified immunity.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party bears the burden of demonstrating that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lankford v. City of Plumerville*, 42 F.4th 918, 921 (8th Cir. 2022). And a dispute of fact is

---

[3] Mr. Villebrun also claims that Officer Nienaber's alleged use of excessive force violated his Fourteenth Amendment rights. However, "the Fourteenth Amendment does not apply to excessive force claims involving arrests, which are appropriately reviewed under a Fourth Amendment analysis." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019).

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In determining whether summary judgment is proper, courts must "view[] the facts most favorably to the nonmoving party and giv[e] that party the benefit of all reasonable inferences." *Nunn v. Noodles & Co.*, 674 F.3d 910, 913–14 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). Moreover, courts must not engage in "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," which are "jury functions[.]" *Nunn*, 674 F.3d at 914 (quoting *Anderson*, 477 U.S. at 255). At the same time, for purposes of summary judgment, a court should not adopt a version of the facts that is "blatantly contracted by the record, so that no reasonable jury could believe it[.]" *Kampas v. City of St. Louis*, 157 F.4th 937, 941 (8th Cir. 2025) (cleaned up) (quoting *Steed v. Mo. State Highway Patrol*, 2 F.4th 767, 770 (8th Cir. 2021)). Courts may consider video evidence in the record. *See Brown v. City of St. Louis*, 40 F.4th 895, 899 (8th Cir. 2022).

## I.    "Under Color of State Law"

It is an "essential element[] of a § 1983 claim . . . that the defendant[] acted under color of state law." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009). To have acted under state law for purposes of § 1983, a defendant "must have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with state authority.'" *Yassin v. Weyker*, 39 F.4th 1086, 1090 (8th Cir. 2022) (cleaned up) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). The under-color-of-state-law inquiry, which asks "whether the conduct is fairly attributable to the State," entails examining "the

nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of . . . official duties." *Id.* (quotations omitted). But it "does not require that the defendant be an officer of the State." *DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999) (quoting *Dennis v. Sparks*, 494 U.S. 24, 27 (1980)). It "is enough that he is a willful participant in joint action with the State or its agents." *Id.* (quoting *Dennis*, 494 U.S. at 27). The under-color-of-state-law determination can be fact-intensive, but when the facts are undisputed, it is ultimately a question of law. *Yassin*, 39 F.4th at 1089–90 (stating that "as long as the underlying material facts are undisputed, courts can decide the question, even when those undisputed facts point in different directions").

Officer Nienaber argues that he was not acting "under color of state law" in part because "each of [his] actions was authorized under White Earth Tribal law, notwithstanding any concurrent state authority." (Dkt. 23 at 8.) While the Eighth Circuit has not addressed this exact issue, other courts have concluded that a tribal officer's possession of concurrent tribal and state authority to act does not preclude a finding that the officer was acting under color of state law. *See Pistor v. Garcia*, 791 F.3d 1104, 1114–15 (9th Cir. 2015) (noting prior decisions concluding that, under certain circumstances, tribal officers could be found to be acting under color of state law where "they were authorized to act under either" state or tribal law) (citing *Bressi v. Ford*, 575 F.3d 891, 896–97 (9th Cir. 2009)); *Evans v. McKay*, 869 F.2d 1341, 1347–49 (9th Cir. 1989)); *see also Black v. United States*, No. C13–5415 RBL, 2014 WL 3337466, at *3 (W.D. Wash. July 8, 2014) (quoting *Evans*, 869 F.2d at 1348) ("Generally speaking, tribal officers 'who act in concert with officers of the state are acting under the color of state law within the

meaning of section 1983.'"). The Court agrees with this body of caselaw and concludes that Officer Nienaber's status as a White Earth officer does not automatically preclude the application of § 1983.

It is undisputed that Officer Nienaber had the authority to enforce the state traffic code and was exercising that authority when he tased Mr. Villebrun. More specifically, he was performing his patrol duties as an officer of the White Earth Police Department, a role that includes the enforcement of both tribal and state law. (*See* Dkt. 25-6 at 1–2 (providing that "[t]he White Earth Reservation is authorized, pursuant and subject to Minnesota Statute Section 626.93 to enforce the criminal laws of the State of Minnesota" when, as here, certain conditions are satisfied); Nienaber Dep. at 80:12–81:22.) Officer Nienaber followed a car he suspected of speeding, but it accelerated away in an attempt to flee. At that point, Officer Nienaber had justification to pursue the vehicle and engaged in a high-speed chase with the squad car's siren and emergency lights activated. (*See* Nienaber Dep. at 85:16–19; 95:18–24 (stating that once Mr. Villebrun sped away, "it turned into a fleeing matter").)

Even when Mr. Villebrun finally stopped and exited his vehicle, he fled on foot a short distance before kneeling. It is clear that the ongoing reason for the pursuit was that Mr. Villebrun had fled from a peace officer and was continuing to do so. (*See* Nienaber Dep. at 26:15–23 (noting that when Officer Nienaber initially attempted to stop the vehicle, the "original reason for the stop" was a suspicion of speeding but that "when the driver sped away, it became a fleeing in a motor vehicle" charge).) And when Officer Nienaber eventually deployed his taser, he was attempting to get Mr. Villebrun to comply with

commands to get down on his belly so that he could arrest him for fleeing. There is no provision in the White Earth Traffic Code criminalizing fleeing a peace officer in a motor vehicle, but it is an offense under Minnesota law. Minn. Stat. § 609.487, subd. 3. Therefore, Officer Nienaber could only have been acting under color of state law when pursuing and ultimately arresting Mr. Villebrun for fleeing. *Johnson v. Phillips*, 664 F.3d 232, 239–40 (8th Cir. 2011) (quoting *West*, 487 U.S. at 49).

Officer Nienaber's own understanding of the role he was fulfilling further supports this conclusion. In a report he prepared after the incident, Officer Nienaber exclusively cited violations of state law, including the fleeing charge. (Nienaber Dep. at 75:24–76:13; Dkt. 25-4 at 1–2.) Even as a tribal officer, Officer Nienaber understood that he was required to be licensed by a state agency and that he served "as both an officer under tribal law . . . [and] also an officer under Minnesota law," with authorized him to enforce state laws. (Nienaber Dep. 81:16–22.) Together, the undisputed facts show that Officer Nienaber was "exercis[ing] power possessed by virtue of state law and made possible only because [he was] clothed with state authority." *Yassin*, 39 F.4th at 1090 (quotation and alteration omitted). In other words, the "nature and circumstances," *id.*, of his conduct bore a relationship to state law such that Officer Nienaber acted as "a willful participant in joint action with the State," *DuBose*, 187 F.3d at 1003, when he pursued Mr. Villebrun for violating a state law and tased him in the course of arresting him. Officer Nienaber's authority to perform state law enforcement functions, which is what he was doing at the time, was derived exclusively from state law. *Cf. United States v. Oakie*, 12 F.3d 1436, 1440 (8th Cir. 1993) (focusing analysis, in the context of a *Bivens* claim, on whether a

tribal officer "was performing federal investigative, inspection, or law enforcement functions at the [relevant] time" (quotation omitted)); *see also United States v. Martin*, 163 F.3d 1212, 1215 (8th Cir. 1998) (citing *Oakie* to support the conclusion that a tribal officer who performed federal functions was a federal officer). The Court concludes there is no genuine dispute that Officer Nienaber was acting under color of state law.

In arguing otherwise, Officer Nienaber points out that Mr. Villebrun is a tribal member who was driving on the White Earth reservation when the pursuit occurred. (Villebrun Dep. 7:9–12, 20:6–10.) Officer Nienaber also cites the tribal laws under which Mr. Villebrun could have been criminally charged. While it is true that officers "enforcing tribal laws or managing tribal affairs" are not acting "under color of state law," *Holtz v. Oneida Airport Hotel Corp.,* 826 F. App'x 573, 575 (7th Cir. 2020) (unpublished Order), the facts emphasized by Officer Nienaber do not establish that he was enforcing tribal laws during his final pursuit and arrest of Mr. Villebrun. The relevant question in determining whether Officer Nienaber was acting under color of state law is not whether Mr. Villebrun could have been charged with violations of tribal law. (Dkt. 23 at 12–13.) Rather, it is whether Officer Nienaber, in stopping and arresting Mr. Villebrun, had the authority to do so "by virtue of state law and made possible only because [he] [wa]s clothed with the authority of state law." *See Johnson*, 664 F.3d at 239–40 (quoting *West*, 487 U.S. at 49).

*Stanko v. Oglala Sioux Tribe*, which Officer Nienaber relies on, does not require a different result. 916 F.3d 694 (8th Cir. 2019). In *Stanko*, the Eighth Circuit concluded that the tribal officers were not acting under color of state law when they arrested and detained a non-tribal offender who was driving on a "federally-maintained" highway within a tribal

10

reservation. *Id.* at 696, 698. In doing so, the tribal officers were merely exercising their "undisputed power" under tribal law "to exclude persons whom they deem to be undesirable from tribal lands[,] . . . to restrain [non-Indians] who disturb public order on the reservation, and if necessary to eject them." *Id.* at 698 (quoting *United States v. Terry*, 400 F.3d 575, 579 (8th Cir. 2005)) (alteration in *Stanko*). Based on the scope of the officers' tribal authority, and the fact that the plaintiff "did not allege that the [tribal officers] were acting under color of state law, as § 1983 requires," *id.*, the Eighth Circuit determined that the plaintiff's claim was likely one arising under tribal law and that he should first "exhaust tribal court remedies," *id.* at 700. Here, in contrast, there is no genuine dispute that Officer Nienaber exercised his state authority when he arrested Mr. Villebrun for fleeing the police and used his taser.

The Court is likewise unpersuaded by Officer Nienaber's focus on his tribal police department uniform and marked squad car. (Dkt. 23 at 14; Dkt. 24-5 at ¶¶ 5–8.) He relies on *Howard v. Weidemann*, which is distinguishable. No. 20-cv-1004 (ECT/LIB), 2021 WL 6063630 (D. Minn. Dec. 22, 2021). There, in addition to wearing a tribal police uniform and driving a marked tribal police car, the tribal officer identified himself as a tribal officer, issued a citation for a violation of the White Earth Traffic Code, and told the driver that the citation "was for tribal court." *Id.* at *3 (internal quotation omitted); *id.* at *4. Moreover, the driver "voiced his disapproval of the White Earth Tribal Police Department throughout the stop, showing his own awareness of the source of [the tribal officer's] enforcement authority." *Id.* at *4. Those facts, taken together, were such that a reasonable jury could only find that the officer was enforcing tribal laws and thus acting under color of tribal law.

11

But here, the fact that Officer Nienaber's squad car and uniform bore the White Earth Trial Police Department's logo, without more, does not require the same conclusion. *See Yassin*, 39 F.4th at 1090–91 (concluding that federal officer was not acting under color of state or local law despite the fact that she introduced herself as a local police officer, filed an incident report with a local police department, and used local practices, because these facts did "not alter the federal character" of her work or "the motivation behind [her] actions," which was derived from federal law).

The Court therefore concludes that Officer Nienaber was acting under color of state law when he tased Mr. Villebrun. Because this means that Mr. Villebrun's § 1983 claim can proceed, the Court turns to Officer Nienaber's argument that he is entitled to qualified immunity. (Dkt. 23 at 20.)

## II.   Qualified Immunity

"Qualified immunity provides some protection against suits for civil damages against government officials." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1255 (8th Cir. 2023). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quotation omitted); *see also Martinez v. Sasse*, 37 F.4th 506, 509 (8th Cir. 2022) (citing *Wesby*). This determination entails "a two-pronged inquiry" that "first asks whether the facts, taken in the light most favorable to the [plaintiff], show the officer's conduct violated a federal right." *Smith v. Conway County*, 759 F.3d 853, 858 (8th Cir. 2014) (cleaned up). Second is "whether the right in question was clearly established at the time of the

12

violation." *Id.* (cleaned up); *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 653 (8th Cir. 2019) (same). "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009). A district court can address either question first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### A.      Violation of a Constitutional Right

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. This protection includes "[t]he right to be free from excessive force in the context of an arrest." *Robinson v. Hawkins*, 937 F.3d 1128, 1135 (8th Cir. 2019) (quoting *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013). In this context, the officer's conduct "should be analyzed under an objective reasonableness standard." *Jackson v. Stair*, 944 F.3d 704, 710 (8th Cir. 2019) (citing *Graham v. Connor*, 490 U.S. 386, 394–96 (1989)). Stated otherwise, "the test is whether the amount of force used was objectively reasonable under the particular circumstances" from "the perspective of a reasonable officer on the scene." *Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012) (quotation omitted). In conducting this inquiry, courts must consider the totality of the circumstances, including, among other things, "the immediate threat the suspect poses to the safety of the officer or others[] and whether the suspect is actively resisting or attempting to evade arrest by flight." *Id.* (internal quotations omitted).

The Court analyzes the two deployments of Officer Nienaber's taser separately. *See Gipp through Kopp v. Webb*, 2025 WL 2630489, at *2 (8th Cir. Sept. 12, 2025) (citing

13

*Cartia v. Beeman*, 122 F.4th 1036, 1041–43 (8th Cir. 2024)). The totality of the circumstances surrounding Officer Nienaber's first tasering of Mr. Villebrun includes the following considerations. There is no doubt that by fleeing from Officer Nienaber, Mr. Villebrun engaged in a serious felony offense. *See* Minn. Stat. § 609.487, subd. 3. It is also true that Mr. Villebrun initially ignored Officer Nienaber's commands by walking away and failing to get on his belly as instructed. He also pushed himself up to his knees when Officer Nienaber attempted to push him onto the ground and ordered him to lay down. But, critically, at the point when Officer Nienaber first deployed his taser, the video evidence supports Mr. Villebrun's claim that any efforts he made to flee had ended. And, as Officer Nienaber conceded, Mr. Villebrun never threatened Officer Nienaber and did not make any furtive movements, nor is there any indication that he had a weapon. (Nienaber Dep. at 46:1–13, 47:2–5, 48:8–19.) Indeed, by then, Mr. Villebrun was kneeling, facing away from Officer Nienaber, remaining still, and had his hands behind his head when the taser was deployed into his back. (Squad-Car Video at 8:50.) From these facts, a reasonable factfinder could conclude that Officer Nienaber's use of force was excessive. *See Shkleton v. Eichenberger*, 677 F.3d 361, 366 (holding that officer's use of a taser violated the Fourth Amendment where the suspect was unarmed, "did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him[]").

The same is true for the second time Officer Nienaber deployed the taser, although it is a closer call. By that point, Mr. Villebrun had fallen forward from the first tasing and was on the ground, visibly in pain as Officer Nienaber continued to yell at him. (Squad-

14

Car Video at 8:59–9:10.) Even though Mr. Villebrun was still noncompliant with Officer Nienaber's orders to "[g]et down on [his] . . . belly," he was lying on his back or side and appeared to be mostly immobile from the impact of the previous tasing. (*Id.* at 9:03–9:12.) And while he appeared to move his arm at some point, it is unclear whether he did so in an attempt to actively resist arrest or as an involuntary response to the first tasing. (*See id.*) Viewing the facts in the light most favorable to Mr. Villebrun, as the Court must at this stage, *see Smith*, 759 F.3d at 858, requires the Court to draw the reasonable inference that Mr. Villebrun was not actively resisting arrest based on this ambiguous movement.

The circumstances here are similar to *Brown v. City of Golden Valley*, where the court held that an officer's use of a taser violated a suspect's Fourth Amendment rights, there was "nothing to indicate that [Officer Nienaber] was faced with the need to make any split-second decisions, nor can the circumstances fairly be described as constituting a 'tense, uncertain, and rapidly evolving' situation." 574 F.3d 491, 497 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 397). And, as in *Brown*, Mr. Villebrun's "conduct did not amount to a severe or violent crime." *Id.* at 496; *see Brown v. Golden Valley*, 534 F. Supp. 2d 984, 992 (D. Minn. 2008) (noting that the suspect had fled from an officer in a motor vehicle, which is a felony), *aff'd* 574 F.3d 491.[4] Under the circumstances, a reasonable

---

[4] Mr. Villebrun argues that the opinions of Officer Nienaber's expert, Chief Mark Bruley, "must be excluded because they opine on the ultimate issue of whether force was reasonable." (Dkt. 28 at 20; Dkt. 24-2 (expert report).) The Court notes that, at this stage, the outcome would not change even if it considered the opinions offered by Chief Bruley. The Court will address whether Chief Bruley can testify as an expert at trial, if necessary, at a later stage of this litigation.

factfinder could conclude that Officer Nienaber's second deployment of the taser was also objectively unreasonable. *See Nelson*, 583 F.3d at 528.

### B.   Clearly Established Right

It is not enough that Mr. Villebrun's constitutional rights were violated. The right at issue must also be clearly established for Mr. Villebrun to avoid summary judgment based on Officer Nienaber's qualified-immunity defense.

"For a right to be clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[T]here does not need to be a case directly on point," *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)), or for "the very action in question [to have] previously been held unlawful," *Meehan v. Thompson*, 763 F.3d 936, 940–41 (8th Cir. 2014) (quotation omitted). Rather, it is enough that "existing precedent . . . placed the statutory or constitutional question beyond debate." *White*, 580 U.S. at 79 (quotations omitted). At the same time, clearly established law "should not be defined at a high level of generality." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). It "must be particularized to the facts of the case." *Id.* (quotation omitted); *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 653 (8th Cir. 2019) (requiring consideration of the specific facts of each case in the excessive-force context). "[T]he dispositive question is whether there was a fair and clear warning of what the Constitution requires." *Thompson v. City of Monticello*, 894 F.3d 993, 1000 (8th Cir. 2018) (quotation omitted).

When the disputed facts of this case are viewed in the light most favorable to Mr. Villebrun, they demonstrate that both instances of Officer Nienaber's deployments of the taser violated clearly established law. *See Kelley v. Pruett*, 163 F.4th 1130, 1134 (8th Cir. 2026) (explaining that courts should identify the disputed facts, construe them in the light most favorable to the nonmoving party, and then "determine if those facts demonstrate a constitutional violation that is clearly established" (quotation omitted)). With respect to the first tasing, the parties dispute whether Mr. Villebrun was actively resisting arrest, sufficiently following Officer Nienaber's commands, and presented a safety threat. Construing those disputed facts in Mr. Villebrun's favor, the Court assumes that Mr. Villebrun was making an effort to comply with Officer Nienaber's commands by kneeling and facing away from Officer Nienaber with his hands placed behind his head, without actively resisting arrest or presenting a safety threat.[5]

The same is true of Mr. Villebrun's behavior at the time of the second tasing. While Mr. Villebrun was not lying on his stomach as Officer Nienaber commanded, the video evidence shows that Mr. Villebrun was laying on the ground on his back or side, seemingly in pain and unable to get up. (*Id.* at 9:02–9:10.) For both tasings, construing the evidence in the light most favorable to Mr. Villebrun requires the Court to assume that he was not actively resisting arrest, posed no safety threat to Officer Villebrun, and was not fleeing at

---

[5] The Court notes that the video evidence and even Officer Nienaber's deposition testimony support Mr. Villebrun's version of events regarding these disputed facts. (Squad-Car Video at 8:38–9:05; Nienaber Dep. at 46:1–13, 47:2–5, 48:8–19, 49:8–13 (stating that Mr. Villebrun did not display "any sort of hostility or aggression," pose a flight risk, or "reach into his jacket[] at any point," and instead "appear[ed] to be submissive").)

the time. The next step is for the Court to evaluate "the constitutionality of the challenged conduct" and determine whether it was clearly established that the Fourth Amendment prohibits the use of a taser in the context of these facts. *Kelley*, 163 F.4th at 1134 (quoting *Shannon v. Koehler*, 616 F.3d 855, 864 n.5 (8th Cir. 2011))

Clearly established law provides that no reasonable officer in Officer Nienaber's position would have believed that the Fourth Amendment supported the use of a taser in either instance. *Jackson v. Stair* is instructive on this point. 944 F.3d 704 (8th Cir. 2019). There, the court determined that the officer's use of a taser on a suspect who "was writhing on the ground, physically unable to walk away or flee"—in other words, while the suspect "did not appear capable of posing a danger to law enforcement," "was not actively resisting arrest," and "was not fleeing"—violated the suspect's clearly established constitutional rights. *Id.* at 713 (stating that this right was clearly established by 2013, when the relevant events occurred); *see also Shannon*, 616 F.3d at 862–63 (holding that "more than de minimis force" was unreasonable where suspect "was not threatening anyone, not resisting arrest, and so on"). In doing so, the court distinguished "[d]ecisions concerning the use of force against suspects who were compliant or engaged in passive resistance" from those that "govern[] an officer's use of force against a suspect who ignores a command and walks away." *Jackson*, 944 F.3d at 712 (citing *Kelsay v. Ernst*, 933 F.3d 975, 980 (8th Cir. 2019)).

As explained above, Mr. Villebrun's behavior could only be described "passive resistance," like that of the suspect in *Jackson*. *See id.* When viewed in Mr. Villebrun's favor, the facts suggest that Mr. Villebrun "did not appear capable of posing a danger to law enforcement" and "was not actively resisting arrest" when he was tased. *Id.* at 713.

Insofar as Mr. Villebrun was "compliant or engaged in passive resistance," *id.*, the clearly established law provided a clear warning that Officer Nienaber was constitutionally prohibited from using more than a de minimis use of force. *Shannon*, 616 F.3d at 862–63, let alone a taser.

Officer Nienaber relies primarily on *McManemy v. Tierney*, 970 F.3d 1034 (8th Cir. 2020), and urges the Court to accept that Mr. Villebrun's stated reasons for not complying with his commands is irrelevant. But *McManemy* is inapposite here. There, the court held that it was reasonable for an officer to tase an uncuffed suspect who resisted arrest by "flailing his legs and refusing to give up one of his arms," even if the suspect had an "innocent" reason for doing so. 970 F.3d at 1039. Even accepting Officer Nienaber's point, however, the analysis does not change. Regardless of his reasons for noncompliance, the relevant fact is that, when the evidence is viewed in the light most favorable to Mr. Villebrun, his noncompliance did not amount to actively resisting arrest. And based on that inferred fact, the Court nevertheless concludes that the tasings violated Mr. Villebrun's clearly established right to be free from excessive force.

In sum, when the facts are viewed in the light most favorable to Mr. Villebrun and all reasonable inferences are drawn in his favor, a reasonable factfinder could conclude that both deployments of the taser by Officer Nienaber violated Mr. Villebrun's clearly established constitutional right to be free from excessive force.

## ORDER

For the reasons discussed above, **IT IS HEREBY ORDERED THAT** Defendant Brandon Keith Nienaber's Motion for Summary Judgment (Dkt. 23) is **DENIED**.

19

20

Date: March 23, 2026                          *s/Katherine M. Menendez*

                                                        Katherine M. Menendez
                                                        United States District Judge